# ATTACHMENT 1

Second and Successive Motion to Vacate Pursuant to 28 U.S.C. §2255

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Civil Action No. _____
Criminal Action No.    1:10-cr-395-LO-1

UNITED STATES OF AMERICA,

     Respondent,

v.

ZACHARY ADAM CHESSER,

     Petitioner.

---

### Second and Successive Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255

---

I, Zakariyya Al-Uztuni (Zachary Chesser), move this court to vacate my sentence pursuant to 28 U.S.C. § 2255. Specifically, I am raising two claims that my convictions for communicating threats on Count One and soliciting hoax threats to endanger people on mass transportation on Count Two violate my rights under the Freedom of Speech Clause of the First Amendment to the Constitution of the United States. These claims are based on *Counterman v. Colorado*, 143 S. Ct. 2106, 2023 LEXIS 2788 (2023), which clarified true threat doctrine and overruled the Fourth Circuit's objective standard to hold the government must prove a speaker consciously disregarded a substantial risk that others would view their speech to be a true threat to commit violence.

1

## Information Required By Standard Form

Previously, this court granted me leave to file without the standard form, because of how it chops up one's motion and my past history of competent litigation, but it still required the same information.

1. Court of Judgment: Eastern District of Virginia, Alexandria Division, 401 Courthouse SQ, Alexandria VA 22314

   Case Number: 1:10-cr-395-LO-1

2. Date of Judgment of Conviction: 10/ /10
   Date of Sentencing: 2/24/10

3. Length of Sentence: Count One (60 months BOP, 3 years supervised release), Count Two (120 months BOP, 3 years supervised release), Count Three (120 months BOP, 3 years supervised release),

   Total: 300 months BOP, 3 years supervision

4. Nature of Crime: (1) Communicating Threats, 18 U.S.C. § 875(c);
   (2) Soliciting and Endeavoring to Persuade Others to Engage in Conduct Constituting a Felony with the Threatened Use of Physical Force as an Element, 18 U.S.C. § 373(a), which was Hoaxes, 18 U.S.C. § 1038, and Conveying False Information about Attempts to Threaten to Endanger Others by Placing a Destructive Device in the Vicinity of Mass Transportation Vehicles, 18 U.S.C. §§ 1992(a)(9), (a)(10) and (a)(2); and
   (3) Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B.

5. Plea: Guilty

6. No trial.

7.

8. No direct appeal

9.

2

10.

11.

## Introduction

I have two of the most novel threat convictions in the history of American jurisprudence. Count One charges me with violating 18 U.S.C. §875(c) by communicating threats against the creators of the television show "South Park" and an individual with the initials "JG" in the course of a globally-covered media campaign I led in 2010. which was literally about the freedom of speech and the First Amendment. While my speech contained violent expression, it was limited to predictions of third-party violence and abstract justifications suggesting such violence might be valid in Islam, and I took extensive public and private efforts to ensure this expression would not be understood as true threats or incitement. What makes Count One so unique, other than its subject matter and publicity, is that my efforts were successful. It is undisputed that my audience, from the show's creators to the New York City prosecutors who publicly declined to prosecute me due to belief my speech was protected, agreed I had not threatened anyone or even incited violence.

What makes Count Two unique is that it charges me for speech encouraging yet more speech, involves three separate First Amendment doctrines (incitement, true threat,

and false speech), and has well over twenty elements because of the prosecutorial gymnastics required to charge me for an online posting which advocated (leaving suspicious (but harmless) bags "in public places" to desensitize bomb squads but which did not advocate actually drawing attention to such bags, meaning I am serving ten years for encouraging conduct outwardly no different than forgetting one's purse on a park bench, nefarious as my motives may have been.

Count Two charges me with violating 18 U.S.C. § 373(a) by endeavoring to persuade others to violate 18 U.S.C. §§ 1038 and 1992(a)(9) by conveying false information about attempts or alleged attempts to violate §1992(a)(10) by threatening to violate §1992(a)(2) by placing a destructive device in, upon, or near a mass transportation vehicle or railroad on-track equipment engaged in interstate or foreign commerce with the intent to endanger others or with reckless disregard for their safety. Doc. 28 p. .

As heady as the First Amendment issues of this charge get, the simplest way to resolve it is going to be that my posting doesn't even allude to mass transportation, which means I clearly didn't incite my nonexistent audience to act with the requisite *Counterman* mens rea respecting mass transportation.

Both of these convictions are fatally implicated by the Supreme Court's holdings in *Counterman v. Colorado*, but in fairly different ways.

In *Counterman v. Colorado*, 2023 LEXIS 2788, the Supreme Court held that the First Amendment protects allegedly threatening speech unless the speaker "consciously disregarded a substantial risk that his communications would be viewed as," id. at 5, "serious expressions conveying that [the] speaker means to commit an act of unlawful violence" (or "true threats") by reasonable recipients familiar with the context of his speech. Id. at 11 (internal quotation marks and brackets omitted). Whether the communication is a true threat or not depends "not on the mental state of the author, but on what the statement conveys to the person on the other end." Id. (internal citations and quotation marks omitted). Because the level of protection afforded to speech depends primarily on its value, not its harms, true threats are not entitled to the same protections as incitement to violence and require a lower mens rea, even though incitement's harms are far more substantial, because the advocacy of violence is closer to the core expression the First Amendment seeks to protect. Id. at 19-20.

*Counterman* generally clarifies true threat doctrine in ways that distinguish it from how the court (and even I myself) understood it at the time of my original 2255, but there are a few key issues that will not be readily apparent to this court pertaining to how Judge O'Grady approached Count One that *Counterman*

5

overrules in my favor. Judge O'Grady held that the advocacy of violence was inherently a "true threat," Doc. 88 pp. 15 & 18-19, and that "[T]he actual recipient of a communication need not feel threatened to constitute a threat." Id. p. 17. Now, it is clear that advocacy of violence must always be analyzed under incitement doctrine and that the undisputed fact that my audience did not perceive a true threat is entirely dispositive. As are my counters efforts to clarify my predictions of violence by others were not threats of violence from my own self.

I do have a "more serious forgone charge" on Count One for violating § 373 by endeavoring to persuade others to commit "acts of terrorism transcending national borders," in violation of § 2332b, so the court will actually have to apply incitement doctrine to my advocacy. However, that doctrine requires advocacy to be both directed toward producing imminent acts of violence and likely to produce imminent acts of violence, and my speech was clearly neither. In fact, one cannot possibly incite a violation of § 2332b in this manner, as it requires transnational conduct. And I said nothing whatsoever suggesting people engage in such transnational conduct to begin with.

Count Two is legally more complex but factually much simpler than Count One. There are three ways Counterman facially invalidate my charge, two of which facially invalidate § 373(a)'s "threats clause."

6

First, speech encouraging threats cannot be properly evaluated when the speakers and speech are hypothetical, as there's no way to clearly establish either the risk of being understood as conveying a true threat nor the speaker's recklessness in this respect. While some threats might be so clear as to allow evaluation, many, including the kind at issue here, are not, so my charge is facially invalid and § 373(a) is overbroad. Second, § 373(c) bars consideration of *Counterman's* constitutionally required mens rea element, which Congress has no authority to do. Third, under the value-based approach, "hoax threats" and "threats to endanger" cannot be proscribed because they are not "true threats," and true threat doctrine trumps false speech doctrine. It would be pretty absurd if insincere threats were somehow less protected than sincere threats to do violence.

That being said, placed bags do not lie about threats to place bombs near mass transportation and I never actually said anything about mass transportation. While adding the *Counterman* elements here is overkill, I'm stuck with that argument for procedural reasons. A person who killed nobody is also innocent of "premeditation," even if that's not the hill any attorney would willingly choose to die on in a case where nobody was killed. The court isn't going to need to address these complex constitutional issues, because my

7

factual innocence is so clear.

## Facts

Because Count One involved a lengthy media campaign with numerous communications and an audience of millions, it is factually pretty complex, but the law is consistently simple. Did I threaten anyone? No. Did anyone perceive a true threat anyway? No. Did I consciously disregard a substantial risk they would perceive one? No. In fact, I took numerous public and private steps to ensure they would not. Did I say a single word about transnational conduct? No. Was my advocacy likely to incite imminent acts of violence? Presumptively, fourteen years is enough time to definitively say. No. Was it directed toward that purpose? No. In fact, I took numerous public and private steps to mitigate risks and perceptions of incitement and was, at worst, indirectly increasing the risk of violence happening "some day" by raising awareness. I am not kidding when I say the prosecution's own sentencing brief claims my speech was protected by the First Amendment, was not a true threat and was not incitement. Read Document 46-1 if you doubt me. There's a lot to cover, but the legal answers are simple.

Count Two has little to cover, and if the government would declassify my actual charged posting there would

be even less. The language of the posting isn't remotely fiery enough to incite, and it had little to no Jihadi audience, especially not in the United States. I did not suggest reporting the bags or indicating they were bombs. The conduct I encouraged was exactly the same as anyone leaving a bag anywhere "in public" for any benign reason. Such bags do not lie about threats to place bombs near mass transportation. Even more clearly, I said nothing whatsoever about mass transportation. Count Two is genuinely frivolous. Of its two dozen elements, I am guilty of zero, unless the court wants to be so granular as to consider things like "endeavoring to persuade others" an element on its own. If the government disputes this, I welcome, solicit, induce and otherwise endeavor to persuade it to produce my actual posting for the court to see.

But, first, the juicy charge: Count One.

## I.    Count One - The "South Park" Campaign

Count One is literally about the First Amendment and the freedom of speech. and the court is going to see that the debate we started in 2010 is still raging to this day and that the then-radical ideas we argued are now a powerful force in our current conversation and are even dominant in academia, the arts and progressive circles.

9

Count One stems from a 2010 media campaign I led with Jesse Morton and the activist group Revolution Muslim. Ex. A¶1; Doc. 28 pp. 6-12. Revolution Muslim was an activist group with militant views, and we frequently held and participated in protests and other demonstrations and expressed violent and inflammatory views to exploit the media's Islamophobic sensationalism and get them to cover our group. Ex. A¶1. However, once we'd gained that platform, we would shift to a more sober and intellectual message about American wars in Muslim countries, imperialism and other issues affecting Muslims. Id. Eventually, we became well-known for our precision in avoiding threats and incitement, to the point that law enforcement agencies in New York City, where we were based, would comment on it and the media would specifically cover this angle. Id. By April 2010, when the events here took place, our strategy had worked well enough that Morton was being interviewed on television for economic and political analysis, not just as a part of some story about militancy and Revolution Muslim. Id. While I was arrested at the age of twenty, Morton, who has since passed away, was valedictorian of Metropolitan College of New York and earned his master's in international studies from Columbia University. Id.

In April 2010, the cartoon "South Park" ran two

10

episodes purporting to "depict" (without depicting") the Prophet (peace be upon him) in a bear costume, in which the citizens of "South Park" wanted him to appear (and actually be "depicted") in their town in the flesh. Id. ¶2. The episodes catalogued all the people the show had mocked over the years, went out of its way to denigrate numerous religious figures in patently offensive ways, and argued the Prophet Muhammad (peace be upon him) should be subjected to the same offensive defamation. Id. However, it portrayed Muslims (broadly) as a violent, backwards, extreme, overly sensitive, and irrational mob intimidating the world into not even depicting him, which was driven home when the bear costume proved to be empty. Id. The episodes were a comment on Muslim pain and outrage over the Danish and Swedish cartoons depicting the Prophet (peace be upon him) as a rapist, a suicide bomber and a dog. Id. Like most of the public, "South Park" wrongly assumed Muslims were outraged over Islam's prohibition on depicting faces in art, when it was really about how they denigrated the Prophet (peace be upon him) and exploited this to pathologize all Muslims as violent, animal rapists and other such Islamophobic tropes. Id. Tropes, it's worth noting, that "South Park" itself largely repeated. Id.

In our usual fashion, I came up with a plan to

11

to use violent but non-threatening and non-inciteful expression to gain media attention, planning to use this to spread a broader message and more reasoned criticism of the show. Id. ¶3. I decided that if our site predicted Jihadis would kill Matt Stone and Trey Parker over these episodes and said they might be justified in Islam, that would exploit the celebrity of the show's creators and get us a lot of attention, so I did this while clarifying that I wasn't personally threatening violence nor even calling for it, but was only making a prediction and calling for dialogue, counterspeech and peaceful protests. Id. And Morton and I really did engage in that dialogue and really did plan peaceful protests, although we never held them. Id. As we always did, we pivoted to a more sober and intellectual message once we grabbed the media's attention. Id. We shifted to a platform of persuasion and education, criticizing the episodes for their Islamophobia (which was real and is why these episodes cannot be streamed anymore) and perspectives on free speech, arguing for new ways of evaluating speech, and tying it all to our broader platform. Id. We had plenty of goals in this, several of which were noble, several of which were atrocious, but none of them included threatening Stone and Parker nor inciting violence

against them, which is why we never did, which is why we took numerous public and private efforts, (conveniently intercepted by FBI surveillance) to ensure we would not be misunderstood as doing either, which is why we were successful and our audience (of millions) agreed we had done neither. Id. As the court will see, that includes the show's creators, countless journalists and even the New York City prosecutors who were really in charge of investigating Revolution Muslim and, unlike the ones here, publicly announced our speech was protected on the lips of the Commissioner of the NYPD.

An important part of this case is how we genuinely persuaded people of our views, including many non-Muslims, which included the Buddhist government of Sri Lanka. My heart is shattered over the very real harms of my words, especially to my fellow Muslims, who are both my greatest victims and the greatest victims of my convictions. But we also started an important public conversation about the freedom of speech that continues to this day, and some of our then-radical ideas are now mainstream and have redefined Western culture on this subject in profound ways. These ideas, in 2024, do not sound nearly the same as they did in 2010, which, I suppose, speaks to the First Amendment's rationale

13

in protecting violent political hyperbole like mine, as much as what I did pains me.

The most unique point we made was that "South Park's" denigration of the Prophet (peace be upon him) and their Islamophobic pathologization of all Muslims furthered oppressive legacies of colonialism, imperialism and America's wars in the Muslim world and provided this violence and injustice justifications from "saviorist" and "civilizing" perspectives. We argued evaluations of which speech ought to be platformed and protected should incorporate consideration of power and oppression and how speech facilitated or upheld the oppression of marginalized groups. We also argued that denigrating (as opposed to criticizing) religious figures and symbols people cherish had little value, that doing so simply to offend people was wrong, that the "equal-opportunity-offender" argument was a cheap excuse, that fears of "slippery slopes" were overblown, and that the solution to the Prophet's exceptional status (peace be upon him) was to extend the same status to other figures, not to take it away. These two arguments, one of which we developed on our own, are the core ideas behind society's shift from free speech absolutism, and the first is even a dominant perspective in academia, the arts and progressivism.

This part of our campaign matters. The fact

14

that our efforts at persuasion were serious, and even effective, and followed a familiar pattern with our group is part of why our clarifications were taken at face value and why people understood Stone and Parker were not really the point of what we did. Unfortunately, the majority of the evidence to this effect is classified, because the government only declassified the evidence it imagined (erroneously) to be incriminating, and most of our campaign was utterly benign, so this court will only have a partial picture here. To have the whole story and not endorse a Soviet-style Kangaroo court in which political dissidents are prosecuted on evidence controlled entirely by the government's decisions about "state secrets," it will have to grant me counsel. That being said, what's here is more than sufficient and the classified evidence is more about showing just how profoundly the government overreached.

In this debate about the First Amendment and the freedom of speech, only one party decided words were insufficient to defend its perspective and chose to impose its point of view through actual violence: the government of the United States of America.

I will now, Allah willing, (1) cover my charged words and postings, (2) cover other uncharged speech, (3) cover the reactions of my audience, and (4) cover other evidence of my

15

mental state.

A. The Charged Communications

Count One is based on five communications from a much wider campaign: (1) my "Original Posting," Exs. B & C, Doc. 32 ¶ 23; (2) my "Defense of the Prophet Campaign Video," Ex. D, Doc. 32 ¶ 24; (3) my "Fox News Interview," Ex. E (partial account), Doc. 32 ¶ 26; (4) my "Clarification Statement," Ex. F, Doc. 32 ¶ 27; and (5) my "Tracking Everyone Draw Muhammad Day Posting," Doc. 32 ¶ 31. Neither my Fox News Interview nor my Tracking Everyone Draw Muhammad Day Posting are in my declassified discovery. It is rather dystopian and revels at the core ideas of the First Amendment to convict someone for speech with secret evidence the public cannot see, but I will need counsel to submit this evidence. As it proves my innocence, I hope the court will allow me that opportunity. Below, I am going to summarize my charged communications then highlight their violent speech and nonviolent calls to action.

1. Summary of Charged Communications

Unfortunately, because Judge O'Grady's legal mistake caused him to believe I was admitting guilt rather than arguing innocence, he saw no point reading what I actually said and deferred entirely to my plea colloquy and Statement of Facts, both of which materially misquote me in objectively false ways and clearly misrepresent my words. In fact, the worst example of

Next, I asked where they lived and linked to an article (Ex. C) mentioning their Colorado town but not an actual address. Ex A ¶ 4; Ex. B pp 2-3. (As I'll cover later, I did this to make it "seem" like I'd provided useful information on where to find them without actually doing so).

After this, I included an audio excerpt of a lecture by Anwar Al-Awlaki describing an incident in which a man was assassinated for defaming the Prophet (peace be upon him) and encouraging the Arabs to go to war with the Muslims and in which he argued insulting the Prophet (peace be upon him) was a capital offense in Islamic law. Ex. B p.3; Ex. A ¶ 4. The audio was the same as in the video I'll cover next. Id. Then it predicted Stone and Parker would end up like Theo Van Gogh while clarifying I wasn't threatening to make that happen. Ex B p.3. Then it cited another Islamic lecture that I don't clearly recall and was not preserved by the government. Id.; Ex. A ¶ 4.

Finally, I said, "You can contact them, or pay Comedy Central or their own company, a visit at those addresses." and then I posted clearly-labeled "fan mail" addresses for Stone and Parker at those companies. Ex. B pp. 3-5.

It's important to point out that my Statement of Facts materially misrepresents this last bit to manufacture violent insinuations that simply do not exist by saying I said my "readers should 'pay them a visit'." Doc. 32 ¶ 23(F). This is just one of many unethical things the government

18

did to (successfully) mislead the court. Their most egregious tactics however, is how they mislabel my charges, deliberately avoid alluding to their elements and try to get the court to find me guilty without any relevant legal or factual analysis, especially on Count Two. I admitted to many false details to save my wife from prison, so I implore the court to please refer to the objective evidence and not uphold my conviction on the basis of things I simply never said.

### ii. The Defense of the Prophet Campaign Video (Ex. D)

On April 18, 2010, I uploaded my Defense of the Prophet Campaign Video to Youtube and posted it to Revolution Muslim and the Mujahid Blog. Ex. A¶5. A transcript of it is at Exhibit D, because the BOP won't let me copy the video. Ex. A¶5. It starts with me summarizing the first "South Park" episode and encouraging my audience to raise awareness and repost the video. Ex. D p. 1. It then contains the aforementioned Al-Awlaki audio. Id. pp. 1-4. It concludes with a call to join our campaign and re-upload the video, suggesting Muslims will never drop this issue. Id. p. 4. The majority of the video plays over images of people who have been targeted for violent retribution for various forms of defamation against Islam. Id. pp. 1-4.

### iii. The Fox News Interview (Ex. E)

On April 19th or 20th, I did an interview with Fox News, in which I calmly explained my postings and Revolution

19

Muslim's broader platform. Ex. A ¶ 6. I explained that the purpose of the violent expression was to convey the severity of the offense in Muslim eyes, that we were considering peaceful demonstrations to prevent future incidents of this kind, and why we opposed the episode. Id. I also reiterated my prediction others might try to kill Stone and Parker while clarifying I wasn't personally threatening to do this. Id. This is partially reflected in the news article at Exhibit E, but the FBI recording of the whole interview is classified, so I request counsel to be able to submit it. Ex. A ¶ 6. There are many other such interviews like this one. Id.

### iv. The Clarification Statement (Ex. F)

On April 21, 2010, Morton and I finished our jointly-written Clarification Statement (Ex. F) called "Clarifying the South Park Response and Calling on Others to Join in the Defense of the Prophet Muhammad - RevolutionMuslim.com," and I posted it on two Jihadi forums, as our website was down. Ex. A ¶ 7.

The essay begins by calling for and trying to foster "rational" and "productive dialogue." Ex. F p.1

It then frames the "South Park" controversy in terms of American imperialism and violence against Muslims and explains how Muslim outrage over the show is due to how it upholds the justifying narratives of this oppression. Id. pp. 1-2.

It continues this line of thought by arguing against

"South Park's" notions that offending people for its own sake is vital to free speech, claiming this idea isn't what the First Amendment is about and that this concept is part of the materialism behind American imperialism and its shift from viewing the freedom of speech as a tool to fight oppression to a tool for upholding it. Id. pp. 2-3. It criticizes "South Park's" equal-opportunity-offender defence and argues the solution to Islam's exceptional status is to extend decency to other religions. Id. p. 3.

The essay then covers the idea that Islamic law generally imposes the death penalty for defaming the Prophet (peace be upon him), Id. pp. 3-5, while clarifying this was not "an absolute call" for that ruling to be imposed on Stone and Parker nor "a deliberate attempt at incitement," but was simply an attempt to "declare the truth regardless of consequence" and make Westerners aware of the issue going forward. Id. p. 3. It characterizes this as "forbidding evil" with one's tongue, "teaching ... the religion of Islam," and "[s]peaking out," while criticizing Muslims for failing to condemn the episodes (but not for failing to use violence). Id. pp. 4-5.

Next, the essay reiterates my original prediction of violence, while clarifying it's just a prediction, was not meant as incitement, and was about conveying the "gravity of the situation." Id. p. 5. It characterizes this as speech in lieu of violence. Id.

The essay then calls on Stone and Parker to mitigate the wounds they'd inflicted with an apology. Id.

Next, it criticizes Muslims refusing to join us and who condemned us by accusing them of serving imperialism and oppression. Id. pp. 5-6. It then explains how imperialists and oppressors justify their injustices by portraying the things the oppressed hold sacred "as backwards" to sanitize imperialist atrocities as "civilizing" them while subverting their religions and cultures. Id. p. 6. It explains how imperialists divide oppressed populations into "good" collaborators and "bad" resistors, rewarding the former and punishing the latter. Id. p. 7. The essay then details how "South Park" and other works by Stone and Parker help uphold this imperialism and argues their speech must be viewed "as part of a broader narrative." Id. pp. 7-8. Then it explains this is all an effort at dialogue and concludes this section by saying:

> We will speak against the perpetuation of this empire. The South Park episode does that by portraying the most important individual for Muslims, presently the predominant ones being conquered, as backwards and irrational. This gives cause and justification to the narrative the empire is not conquering at all and instead is attempting to liberate.

Id. p. 8.

The Clarification Statement concludes by noting we planned to host conversations (wedid) in the future, warning other Muslim reactions to future incidents might be violent, and citing Osama bin Laden's threat regarding the Danish cartoons

as evidence. Id.

My Statement of Facts misleadingly takes the Bin Laden quote out of context to portray a "warning" to the entire world like a true threat against Stone and Parker. Doc. 32 ¶ 27. Less material, but still proof my "admissions" weren't accurate, is this paragraph's false claim I posted this to Revolution Muslim, which was down at the time due to hacking Ex. A ¶ 7. When prosecuting Morton, the government admitted it knew this. Ex. G ¶ 21 fn. 1. My Statement of Facts was not sworn, and my admissions paint an incomplete and inaccurate picture that falls short of guilt. The government wants the court to ignore the evidence. All I ask is that it actually review it.

### v. The Tracking Everyone Draw Muhammad Day Posting

On May 18, 2010, I posted my Tracking Everyone Draw Muhammad Day Posting to the private section of a small online Jihadi forum called Ansar Al-Jihad. Ex. A ¶ 8. It collected publicly available information from eleven people's Facebook pages after they'd joined an event scheduled for May 20, 2010 called "Everybody Draw Mohammed Day." Id. Most of the information was not very detailed, but it had profile pictures and the names of places some of them attended. Id. While my Statement of Facts says I posted addresses, I'm virtually certain I did not, and I request counsel so I can prove this by submitting this classified post. Id. The government claims I mentioned "JG" in this posting

but no details about what I said and I do not remember any, except that ~~there is~~ no rational reason for JG to be singled out and not the other ten people. Id. I ended this posting with the words: "Just a place to start." Id. As will follow, I meant "start collecting information" not "start killing." Id. There were no other words and there was nothing violent in this posting at all. Id. While it was made in the same "subject" as my "South Park" postings on this forum, they were long buried and had zero emotional or textual connection to this posting. Id.

## 2. Violent Expression and Nonviolent Calls to Action

My violent expression fell into two categories: (1) predictions of third-party violence and (2) abstract advocacy of violence. Because of his reliance on a false quotation in my Statement of Facts, Judge O'Grady interpreted some of my calls for protests, dialogue and counterspeech as veiled calls for violence. While the First Amendment protects even successful calls for mass murder as long as they aren't so immediately pressing and viable that the audience won't have time to reflect, Judge O'Grady was mistaken, and we actually engaged in or planned all ~~those~~ peaceful responses we called for, as the court will ~~see~~ in later sections. Also, one of the main "admissions" he relied upon is something I have no knowledge of, is inadmissible, is a far cry from incitement and is virtually meaningless. This is my admission that my audience "*likely* included individuals

around the world who . . . [W]ould potentially be willing and capable to attack [Stone], [Parker], and JG in response." Doc. 32 A32 (emphasis added). Moreover, I only admitted the government could prove this at trial and my admissions weren't even sworn. Doc. 32 pp. 1 & 14-15. And this, after fourteen years, obviously wasn't true. Additionally, it must be noted that there is literally nothing in any of my speech suggesting I encouraged "conduct occurring outside of the United States in addition to conduct occurring in the United States." §2332b(g)(1).

The court will see that even my most violent expression was either predicting third-party violence or advocating the abstract justification of that violence and always came with meaningful clarifications to mitigate perceptions of true threats or incitement.

### i. Predictions of Third-Party Violence

There were several predictions of third-party violence in this campaign, all of which were clarified to be mere "predictions" and "warnings," not threats:

1. We have to warn Matt and Trey that they will probably wind up like Theo Van Gogh for airing this show. This is not a threat, but a warning of the reality of what will likely happen to them. Ev. B (Original Posting) p. 3.

2. It's not a threat, but it really is a likely outcome. They're going to basically on a list in the back of the minds of a large number of Muslims. It's just the reality. Ex. E (Fox News Interview) pp. 1-2.

3. Thus our position remains that it is likely the creators of South Park will indeed end up like Theo Van

Gogh. This is reality. . . . We are not trying to directly incite violence, but we are trying to explain the gravity of the situation and prevent this from occurring ever again. . . . [I]f one cannot alter the situation with their hand then they must speak out against it and try to change it that way." Ex. F (Clarification Statement) p. 5.

There is a fourth "warning" which also contains a call for dialogue that belongs in the next section, but this warning is directed at the entire world, not Stone and Parker, and clearly characterizes our entire response as "speech:"

We hope that the creators of South Park may read this and respond, that before sending hate mail and condemning us that we may partake in dialogue. and that the Western media's degredation of the most blessed of men ceases. Otherwise we warn all that many reactions will not involve speech, and that defending (against) those that insult, belittle, or degrade the Prophet Muhammed (peace be upon him) is a requirement of the religion. As Osama bin Laden said with regard to the cartoons of Denmark, "If there is no check in the freedom of your words, then let your hearts be open to the freedom of our actions.

Id. p. 8. It might still be an "awful" statement, but this shows that the government's excision of only the Bin Laden quote is outright dishonest even in the context of this paragraph. not to mention the entire essay.

### ii. Advocacy of Violence and Calls for Nonviolent Action

Both the Original Posting and the Defense of the Prophet Campaign Video. Exs. B & D, contained the same Al-Awlaki audio mentioning an event from Islamic history that he uses to argue the punishment in for insulting the Prophet (peace be upon him) is

death in Islamic law, and both contain content that suggests on some level that I would support that ruling being applied to Stone and Parker, although there is nothing clearly indicating that or calling for actual violence, nor is there anything approaching a fatwa from an Islamic scholar declaring that this general Islamic ruling should be applied to the specific case of Stone and Parker. A critical part of the context here is that I was (and am) a lay Muslim who could mention general Islamic rulings but not issue judgments or fatwas that considered all relevant issues in applying them to specific cases like this one, and before even any Jihadi was likely to act they would require such a fatwa. Ex. A # 9. Another critical part of this context is that this was still in the period before Al-Qaidah announced its strategy of inspiring Jihadis in the West to carry out their own attacks, so individual Jihadis still required specific approval from groups like Al-Qaidah before they would engage in violence. Id. In reading my expression, it's important to understand the culture and strict moral code behind it and that, for lay Muslims, such precision and apparent equivocation is often because they are, in fact, equivocal and are carefully trying to avoid speaking about an Islamic issue without knowledge, which

is one of the worst sins in Islam. Id. One could think of it like a private in the army telling other privates what ought to be done without word from a commanding officer saying they had permission to do that. Id. A fatwa is like that permission (it's not a command). Id. My communications lacked such a fatwa, and the court will soon see that this was widely noted by my audience.

While the Original Posting contained information on where Stone and Parker lived, Ex. B pp. 2-3, it required readers to click a link and that link only gave their town, not their address. Ex.C. Also this occurred after the posting's least inflammatory section. The actual addresses are clearly labeled "fan mail" addresses, and I only actually called on people, consisted with Revolution Muslim's history, to write to Stone and Parker or "visit" associated companies, which, as the court will see later, was a call for protests, not violence. Ex. B pp. 3-5. In any case, those companies are not Stone and Parker. The Defence of the Prophet Campaign Video similarly only encourages counterspeech and raising awareness. Ex. D pp. 1 & 4.

While both communications are incredibly suggestive, they lack the sort of language and authority that could incite imminent acts of violence, occur

28

on the internet where such incitement is virtually impossible, and contain literally nothing suggesting readers engage in conduct both inside and outside the United States in the process of imminent acts of violence against Stone and Parker. "You can contact them, or pay Comedy Central or their own production company a visit at these [fanmail] addresses." Ex. B p. 3. "[D]ownload and reupload this video, and spread the word however you can." Ex. D p.1. These are not the fiery statements of one trying to incite a mob to immediate action.

In the Fox News Interview (and elsewhere), I clarified the violent expression was meant to "raise awareness" and "'explain the severity' of what Stone and Parker did." Ex. E p. 1. I told Fox that Revolution Muslim was "considering a protest against the 'disgusting' show" to "'do whatever we can to make sure it does not happen again.'" Id. p. 2.

The Clarification Statement has my first words mentioning the general ruling of capital punishment for defaming the Prophet (peace be upon him), but they are hardly fiery and inciteful, come in the context of a much broader essay, recognize room for other views, characterize themselves as 'speaking out,' and are coupled with numerous clarifications to mitigate any risk of incitement. Ex. F pp. 3-5. "This shows that taking

this stance is virtually obligatory, but it does not mean that our taking this stance is in some way an absolute call toward the requirement that the creators of South Park must be killed nor a deliberate attempt at incitement it is only to declare the truth regardless of consequence and offer an awareness in the mind of Westerners when they consider doing the same thing." Id. p. 3. "We are not trying to directly incite violence, but we are trying to explain the gravity of the situation and prevent this from occurring ever again." Id. p. 5.

The overall persuasive character of this essay and its calls for dialogue also disprove incitement:

> [W]e are not against rational dialogue. . . . We live in an age of media concision . . . which tends to afford little opportunity for in depth discussion. Our intention with this . . . is only . . . to create . . . a deeper and more productive dialogue. . . .

Id. p. 1.

> We would also like Mr. Stone and Mr. Parker to understand the tastelessness of their portrayal, apologize and reflect on the words that follow.

Id. p. 5

> [O]ur intention is . . . to engage both Muslims and non-Muslims in a much deeper discussion. . . . We implore conscious people to [speak out] and we are open to the advice, suggestions, and general conversation with all those that would like to engage in detailed discussion, we plan on hosting some open dialogue opportunities as soon as our website is back up and running. . . . We hope that the creators of South Park may read this and respond, that before sending hate mail and condemning us that we may partake in dialogue, and that the Western media's degradation of the most blessed of men ceases.

Id. p. 8.

At worst, and this isn't a fair reading, my speech was trying to provoke violence at some unknown future date after dialogue was exhausted and proven unsuccessful, and there is nothing whatsoever related to § 2332b's international elements.

The Tracking Everyone Draw Muhammad Day posting doesn't even contain "rhetoric," let alone "violent rhetoric." has no inciteful language, no calls to action, no clear audience, no allusions to international travel, and nothing whatsoever satisfying even half an element of the foregone charge. Even if it did, the event in question hadn't happened yet and there was no way to judge JG's conduct.

At the end of the day, nobody ever acted on my words. Not imminently. Not ever. Even in the case of the January 6th riots, the government decided it could not charge Donald Trump with incitement, and he literally incited them. They actually happened. Nobody intervened to prevent people acting on my words. My words simply failed to do what the government pretends they were meant to do. After fourteen years, it is safe to say they were not "likely to produce imminent acts" of violence. This, not my guilt, is proven beyond a reasonable doubt.

## B. Uncharged Communications

The case is over. My speech's worst elements fail to

contain incitement or true threats. The majority of my campaign was purely nonviolent and even more exculpatory than the charged postings, but, because of our dystopian surveillance state that allows political dissidents to be convicted on the basis of secret evidence's sham protections, the government only declassifies the evidence it finds most incriminating and leaves the rest classified, denying defendants any real way of participating in their own defense, especially at the postconviction stage. To mitigate this, the court will need to grant my motion for counsel. That being said, while I am denied access to the majority of my own words in this campaign, memory and corroborating evidence suffice to demolish even the legally inadequate insinuations the government tries to squeeze from the declassified postings.

Morton and I engaged in multiple other interviews with the media, which the FBI recorded, but which I cannot fully provide, because those recordings are classified. One of these was my interview with CNN, which is accurately, but partially, reported on in Exhibit H. Ex. A #10. I told CNN

"the purpose of including the Al-Awlaki sermon in [my] posting was to remind Muslims that insulting the prophet is a severe offense for which the punishment in Islam is death." Ex. H p. 2. I also told them my original posting "was meant to show those offended ... how they

can voice their opposition, including by sending letters to the South Park's creators. [And that our group was] also considering demonstrations." Id. p. 1. We were calling for "protests, not violence." Id.   As I noted in the beginning, CNN also reported on Morton's past words clarifying that, despite believing it justified, Revolution Muslim did "not encourage any violence on U.S. soil." Id. p. 2. And the article noted we were known for this sort of speech. Id.

Exhibit I is a *New York Times* article for which Morton participated in an interview. He "repeated [our] assertion that the [Original Posting's warning] was a prediction rather than a threat. He said the post on [our] blog 'was intended in a principle that's deeply rooted in the Islamic religion, which is called commanding the good and forbidding the evil.' He tied [our] complaints about 'South Park' to larger frustrations about American support for Israel and the wars in Iraq and Afghanistan." Id. p. 3

We both gave other interviews, all of which explained we were simply predicting third-party violence, were not calling for violence, were calling only for protests and counterspeech, and detailed our criticisms of the show and American policies we saw as part of its context. Ex. A ¶ 11. These, of course, are classified. . . .

Morton and I also did, in fact, engage in plenty of

dialogue, and Morton hosted the "open dialogue sessions" we mentioned, Ex. F p. 8, in our Clarification Statement. Ex. A ¶ 12. We discussed issues in the media, online and over email as well. Id. Of course, the FBI intercepts of all of this are classified, but we convinced plenty of people, including non-Muslims. Id. Exhibit J is a copy I of an interview I did with Aaron Zelin (full copy at Doc. 81-9) shortly after this campaign was over, but before my arrest. Ex. A ¶ 13. In it, I said, "The 'clarification' was issued as a way of changing the dialogue.... [A] lot of non-Muslims were willing to discuss various issues and most of them came away with a much better understanding of the... grievances that Muslims hold. A lot of non-Muslims were supportive of what we said." Ex. J p. 2. This interview is itself a form of dialogue, as are all the others.

    This is not a close case. This is not an example of anyone straddling the border between protected and unprotected speech. As the court will see in the next section, the world agreed I did not threaten or incite violence. In fact, the New York City prosecutors assigned to investigate our New York City organization were so confident of our innocence and our speech's protection that

they publicly announced it.

## C. The Understandings of our Recipients

There is a reason Judge O'Grady had to explicitly disregard the reactions of my audience to uphold my conviction: they were universally exculpatory. I am the only person in the history of true threat doctrine and incitement doctrine whose conviction was affirmed where the audience perceived neither true threats nor incitement. The only debate was whether my postings still "posed a threat" by "increasing the risk" of violence. Most were still very hostile to our expression, but some were neutral and others were even persuaded.

Stone and Parker themselves went on camera to explain "they're not afraid" and didn't think my words posed any threat. Ex. A ¶ 14; Ex. K p. 2.

"Police Commissioner Raymond W. Kelly said the New York Police Department was 'aware of the threat, and we've looked at it.' He added, 'We don't think that this threat, as is currently assessed, rises to a crime right now.'" Ex. I p. 3. In other words, prosecutors and police specifically looked at my speech (including their intercepts) and concluded it was neither incitement, nor true threats, nor any other crime with enough confidence that they took the incredibly unusual

step of publicly announcing it. I was only prosecuted in Virginia because New York prosecutors were convinced I was innocent.

The most disturbing piece of evidence in this entire case is not the Original Posting with the picture of Theo Van Gogh's corpse at the top; it is the editorial by Ayaan Hirsi Ali, an Islamophobic hatemonger who has written books claiming, among other things, that Muslims are sexual predators and rapists, which is the sole attachment to the government's sentencing brief. Doc. 46-1. What makes this so disturbing is not the prosecution's flagrant appeal to Islamophobia to demand a maximum sentence. Nor is it even how the prosecutor exploited this editorial to further his well-documented personal views that Islamophobically pathologize the entire Muslim population and even, quite ironically, support illegal violence against them in Palestine. Nor even how his vicious Islamophobia caused him to further wound the greatest victims of my own awful, hateful and violent expression—my fellow Muslims—in a proceeding that ought to have centered and tried to heal their pain. No. What makes this so disturbing is that this notorious hatemonger so clearly describes my innocence and

my speech's protection under the First Amendment and so plainly demonstrates the wrongness of the government's use of violence to settle this debate. Yet, the government used it to demand the maximum sentence.

"According to First Amendment experts," Ali says nearly at the outset, "technically speaking this posting does not constitute a threat." Id. p. 1. She even goes on to clarify that I genuinely was not calling for violence or trying to incite it, agreeing I hadn't issued a fatwa that would be required for that purpose, but she argues that simply by speaking out, "forbidding evil" and raising awareness, I had increased the risk of violence to Stone and Parker from Muslims who might independently conclude they deserved to be killed. Id. pp. 1-2. In the spirit of the First Amendment, she argued that the solution to my speech was counterspeech. Id. p. 2. Which, I'd note, is the only thing I actually called for myself. Yet, the government, with a bloody knife in its bloody hands, weeping over the bloody corpse of the First Amendment looked my way, attached this editorial to its brief, and shouted, "Murderer! Seize him! Bury him in the dungeon for the violence he has done to *our* freedom of

speech!" I am undoubtedly the only American ever to have a prosecutor demand the maximum sentence based upon an editorial claiming they were innocent.

And even that same government is incapable of actually alleging I threatened or incited violence. Its own Statement of Facts merely accuses me of sort of kind of maybe calling for violence that "could possibly" be acted upon. Doc. 32 ¶ 32. Their own sentencing brief's whole argument is that the "threat" to Stone and Parker would last forever, which is literally the opposite of imminency. Doc. 46 pp. 7-10. And this kind of "threat" is not the kind necessary to establishing guilt. Similarly, when the FBI charged Morton, they were only able to frame the public's reaction in this way, claiming my "post engendered significant media attention and public reaction, and was widely perceived as a threat to the safety of [Stone] and [Parker] by implicitly inciting extremists to kill them." Ex. G ¶ 11. Even this hyperbolic characterization couldn't manage to accuse me of threatening Stone and Parker with violence, only of posing a threat to their safety. And while it accuses me of "implicitly inciting extremists," implicit incitement is a far cry from the mind-robbing fiery rhetoric and passion

38

of someone trying to incite imminent acts of violence.

These are people doing all they can to manufacture a crime where there is no crime to be found. Ali was trying her hardest to exploit my posting to fuel Islamophobia. The NYPD was actually the law enforcement body leading the investigation of Revolution Muslim, not the FBI's Washington Field Office. Stone and Parker were the subjects of my admittedly brutal expression. These are the most hostile members of my audience, to the point that normally no court would even consider what any of them but Stone and Parker had to say. Even *they* did not perceive a true threat or incitement. Even *the prosecution* did not actually believe I'd done things that meet the legal elements of the crimes they accused me of committing. Ladies and gentlemen of the jury, it is *as if* he robbed the bank! You must convict!

More neutral observers recognized my speech was merely a "warning," Ex. H p. 1, Ex. I p. 1, or an "ominous message," Ex. I p. 1, that "raised concerns that the show's @creators...might be in danger," Ex. K pp. 1-2. Even Fox News referred to it as a "warning." Ex. E p. 1. As did a Sri Lankan news outlet. Ex. L p. 2. In fact, this Buddhist outlet expressed agreement with

39

our message and reported the government had taken official action against "South Park" over its defamation of Buddha. Id. The Week used scare quotes when calling my posting a "threat," and it presented Ali's editorial as a more sensationalist perspective, quoting Leslie Gornstein and Ibrahim Hooper that I lacked the "credibility" to even increase the risk of violence, let alone incite it. Ex. k pp. 2-3. And CNN recognized my speech was a "call to protest, not violence." Ex. H p.1. The three experts in the Zelin interview noted the Clarification Statement dispelled perceptions I might be expressing an "implicit call or at least support for violence." Ex. J p.2. In other words, the worst reaction to my speech was a temporary perception that I was implicitly calling for violence, which is a far cry from the incitement test, and even this perception did not persist. Jeffrey Toobin, a former assistant United States attorney, told CNN, "Certainly the comment on this website is very ugly, but it is certainly not specific enough to get anyone arrested." Ex. H p.2. And "federal officials" told CNN our speech was "protected under free speech laws of the United States." Id.

Even the DOJ was once able to admit I was

innocent and that my speech was protected.

### D. My State of Mind and Efforts to Mitigate Risks

This isn't a case where the speech that was actually communicated posed a substantial risk of being understood as true threats or was likely to incite imminent acts of violence, so there is no criminal action to which one could apply a mens rea element. This is like a murder case in which the alleged victim was simply on a vacation or lost in the woods. It doesn't much matter how intentionally, knowingly, recklessly or negligently one did not kill them, even if one fully intended to kill them. But the mens rea element is also missing and is one of the clearest issues in this case, since both my public words and the private communications the FBI intercepted show I took sincere and believable efforts to mitigate the risk incitement or true threats would be perceived, and the FBI even secretly recorded Morton and I strategizing how to avoid being understood in either way. The government's contention is that we only did this to avoid going to prison. While that is only partially true, this is a perfectly fine reason not to break the law.

Threatening and inciting violence against Stone, Parker and JG simply were not among my

goals in this campaign. Ex. A at 15. My posting mentioning JG wasn't even intended to convey a violent message. Id. While my expression about Stone and Parker was very much intended to be violent, I was careful to avoid being understood as threatening or inciting violence and my goals with this campaign were to foster dialogue and debate, expand the platform available to Revolution Muslim and reach a larger audience, convince non-Muslims to stop platforming speech denigrating the Prophet (peace be upon him) and other religious figures, to replicate the Islamophobic backlash of the Salman Rushdie affair to push more Muslims toward militant solutions, to raise awareness of what I believed to be the general Islamic ruling of capital punishment for anyone defaming the Prophet (peace be upon him), and to create enough controversy to prompt an actual Islamic scholar to issue a fatwa as to whether or not this general ruling should be specifically applied to Stone and Parker. Id.

Some of these goals were awful, while some were more noble, and this muddy truth is the key to understanding my campaign. I am not someone who can claim the sort of sympathetic innocence a defense attorney would prefer to argue, and I'm

42

I'm not going to pretend my political hyperbole did not have countless very real victims as a defense attorney would do, because I truly regret that and believe it is wrong to decenter their suffering. This is especially the case because the ones I hurt the most were my own fellow Muslims and the government savagely exploited my convictions to pathologize them, to justify repressive policies against them and to force them to censor their cultural, political and religious expression. They are victims both of my speech and my prosecution, and they've never had their suffering recognized, so I feel I owe it to them to present the full story of what I did. And that story is vicious. But it is not the purely vicious story the prosecution wants to paint either, and the clarity of my speech's protected status is absolute. Awful as some of my goals were, not one is unprotected.

Below, I will cover first the "South Park" campaign and then JG.

## 1. The "South Park" Campaign

There are three broad categories of evidence respecting my mental state: contextual evidence, direct evidence and evidence pertaining to my objectives and goals.

### i. Context Relevant to My State of Mind

Before getting into more direct evidence, four important points must be made about the context. First, as preceded, Revolution Muslim had a long history of this sort of political hyperbole, violent but protected expression that was used to draw attention to more substantive views, and precisely the kinds of militant-but-peaceful protests I was calling for, and I (correctly) expected to be understood in light of this well-known history. Ex. A ¶ 16. Second, I was raised by prosecutors and had a vague awareness of the now-overruled objective test for true threats and knew it was a recipient's perception that mattered, which is why I was so careful to clarify my expression. Id. ¶ 17. Third, this campaign came at the end of an era in which Jihadis required specific direction from groups like Al-Qaidah to act violently, so I did not believe my words could directly produce violence without specific sanction from one of these groups. Id. ¶ 18. While it would be announced later in 2010, the strategy of "inspired" attacks and Al-Qaidah's general call for Western Jihadis to carry out their own operations had yet to be publicized, so the last fourteen years of "homegrown" attacks was not part of my understanding. Id. Fourth,

I was twenty. As a twenty-year-old, I was not very reflective or self-aware, did not carefully evaluate the consequences and implications of my ideas, was myopically dedicated to my cause's strategic ambitions and was totally unconscious of its moral contradictions, including things like how I was fueling Islamophobia to push Muslims to support militant solutions to Islamophobia. Id. A 19. At thirty-four, it isn't hard to see the inconsistencies of some of my ideas and objectives, but these inconsistencies don't change the fact that these were my ideas and objectives. This isn't some sort of defense of my notions. It is merely a presentation of the reality of what I imagined and understood.

## ii. Direct Evidence Regarding My Mental State

The most important direct evidence of my mental state preceded, and that evidence alone is insurmountable. I took numerous efforts within my speech itself to mitigate risks others would perceive threats or incitement, I never characterized my speech in any way supporting such interpretations, and my audience did not understand me to be threatening violence nor to be inciting imminent acts of violence. We really were planning protests and really did engage in the dialogue that we called for, and decisive proof of this

is in the classified evidence I could submit, Allan willing, with counsel. Ex. A ¶ 20.

I have consistently denied any intent to threaten or incite violence for over fourteen years now, and I told this to the government as soon as I pled guilty, and even repeated it in an effort to take the blame for our campaign that clearly wasn't aimed at arguing my innocence. Id. ¶ 21. Exhibit M is an August 2012 article I wrote about my post-arrest experiences, mainly dealing with a child custody case involving my son (the entire document is available at Doc. 81-1). Ex. A ¶ 21. In this document, written before any real traction for a higher mens rea was gaining sway in courts, I wrote:

> As far as ... [Morton] is concerned, then I told the government ... they were incorrect in thinking we meant the posts as a threat or any of the other various things they kept trying to get me to say. ... I was the one in charge of removing anything which was remotely threatening in the press release Revolution Muslim did, and if I missed anything, then it was my fault. ... My posts were the ones which were closer to crossing the line on the matter of being a threat, but [Morton] was definitely not trying to threaten anybody.

Ex. M p. 2. This attempted confession of guilt is actually a confession of innocence.

Sincere as this was, there is much clearer proof of my lack of the required mens reas. Even though it

was only declassified, in our great modern Orwellian tradition, because the FBI thought it was profoundly incriminating. There are cherry-picked details from my emails and phonecalls with Morton showing we were both more than careful and took sincere efforts to mitigate risks we'd be misunderstood as threatening or inciting violence (which, aside from a couple special agents and one assistant U.S. attorney, were a total success).

In charging Morton, Special Agent Menges revealed that "after considering that an off-the-cuff remark might establish that [we] intended to incite violence and subject [us] to criminal liability," Morton and I "decided to stop talking to reporters about the *South Park* matter and issue a written statement instead." Ex. G ¶ 19. Case closed. Innocence proven. We didn't see our past speech as doing this, and we were proactively trying to avoid it with our future speech. The government's contention that we merely avoided breaking the law to avoid prison is a conversation for the therapists of prosecutors in a dystopia imagined by Franz Kafka, not a court of law. This is literally sufficient proof of my innocence on its own, but there's much more compelling proof in what followed.

On the evening of April 20th, after having this conversation, I emailed Morton the first draft of the Clarification Statement. Ex. G ¶ 20. "Early the next morning, Morton emailed a revised draft back to [me], and suggested [I] then post it on Revolution Muslim's blog. Morton's revision ... included for the first time the reference to bin Laden.... Also, in this draft, Morton inserted for the first time, 'Thus our position remains that it is likely that the creators of South Park will indeed end up like Theo Van Gogh, *and we pray that Allah makes this a reality*' (emphasis added)." Id. ¶ 21.[1] "[I] returned a third version to Morton in the early afternoon of April 21st, retaining the bin Laden reference at the end, but changing Morton's language ... to 'Thus our position remains that it is likely the creators of South Park will indeed end up like Theo Van Gogh. *This is reality*.' (emphasis added)." Id. ¶ 22. "According to the court-ordered intercept of [our] phone call, the subject of [my] deletion of Morton's words '*and we pray that Allah makes this a reality*' arose in [our] subsequent telephone conversation. Morton and [I] were discussing the opportunity that the

---

1   The FBI affidavit confusingly uses brackets to make the first letters of sentences lowercase, so I've removed these and restored original capitalization for normal style.

48

South Park controversy provided to disseminate the Revolution Muslim message." Id. ¶ 23. I mentioned data showing we'd achieved very high levels of online traffic, and "Morton told [me] that 'it [the South Park campaign] was very, very, very strategic so far, but we have to be careful, I don't want to go to prison to be honest with you.' [I] responded, 'That's why I took out your dua [prayer to Allah] in the middle of the article.' Morton then said, 'oh, we pray that the obligation is fulfilled. Oops. Yeah, yeah, right. I was a little tired man. I probably didn't think.'" Id. ¶ 23.

There is no gun. There is no smoke. The FBI portrays this like wiping fingerprints away after pulling the trigger to avoid being caught, but this is a decision not to pull the trigger at all to avoid even the possibility of breaking the law. In truth, I could have obeyed Morton and posted his version and our speech would have been just as protected, but I was being far more careful than the First Amendment requires. My philosophical reasons for taking measures to mitigate any risk of incitement or true threats being understood are irrelevant. All that matters is that I took steps to avoid those possibilities, which isn't even negligence,

49